**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Patrick Scott Baker, *et al*.    :
    :
     Plaintiffs,    :
    :
    v.    :    Civil Action No. 03-cv-749 (JMF)
    :
Socialist People's Libyan Arab    :
Jamahirya, *et al*.    :
    :
    :
     Defendants.    :
_____:
    :
Jackie Nink Pflug, *et al.*,    :
    :
     Plaintiffs,    :
    :
    v.    :    Civil Action No. 08-cv-505 (JMF)
    :
Socialist People's Libyan Arab    :
Jamahirya, *et al*.    :
    :
     Defendants.    :
_____:

**MEMORANDUM OPINION**[1]

## I.    INTRODUCTION

    Before me at this time are two actions:  <u>Baker v. Great Socialist People's Libyan Arab Jamahirya</u>, No. 03-CV-749, which was filed on March 3, 2003, and <u>Pflug v. Great Socialist People's Libyan Arab Jamahirya</u>, No. 08-CV-505, which was filed on March 24, 2008.  The named Libyan defendants were dismissed from each of these actions pursuant to the enactment of the Libya Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008), but the plaintiffs' claims remain pending against the following defendants:  the Syrian Arab Republic;

---

[1] This Memorandum Opinion consists of the Court's findings of facts and conclusions of law. The Court's <u>Preliminary Findings of Fact</u> [#121] will be vacated.

the Syrian Air Force Intelligence agency (Idarat al-Mukhabarat al-Jawiyya); and Syria's Director of Military Intelligence (General Muhammad al-Khuli) (hereinafter collectively the "Syrian defendants" or "Syria"). These actions came before this Court as the subject of an evidentiary hearing held on May 3-7, 2010. Pursuant to those hearings and the evidence before me, the Court has made the following findings of fact and conclusions of law.

## II.    SUMMARY OF FINDINGS

These actions seek judgment and an award of damages for acts of state-sponsored terrorism that resulted in the hijacking of EgyptAir Flight 648 on November 23, 1985, while the aircraft was bound for Cairo, Egypt from Athens, Greece, and the execution-style shooting of three Americans, the plaintiffs in these actions:  Patrick Scott Baker; Jackie Nink Pflug; and Scarlett Marie Rogenkamp.

The Court, having heard and reviewed the evidence, does hereby determine (i) that the hijacking of EgyptAir Flight 648 on November 23, 1985 (the "EgyptAir hijacking") was an act of international terrorism; (ii) that the terrorist shootings of the American victims of the EgyptAir hijacking—Patrick Baker, Jackie Pflug, and Scarlett Rogenkamp—were acts of international terrorism that occurred during and as a result of the November 23, 1985 terrorist hijacking; (iii) that said hijacking was committed by terrorist operatives of the Abu Nidal Organization ("ANO"), which has been designated by the U.S. Department of State as a Foreign Terrorist Organization; (iv) that the ANO, at the time of and prior to the EgyptAir hijacking, was sponsored and supported by Syria, which has been designated by the U.S. Department of State as a State Sponsor of Terrorism; (v) that the Syrian Arab Republic, the Syrian Air Force Intelligence agency, Idarat al-Mukhabarat al-Jawiyya, and Syria's Director of Military

Intelligence, General Muhammad al-Khuli, conspired with and provided substantial and material support to the ANO terrorist organization; and (vi) that the Syrian defendants caused and are liable for the acts of international terrorism against the plaintiffs, for which the Court will award damages as set forth below.

The Court further finds that the Syrian defendants provided material support and resources and conspired with the ANO in the planning, training, support for, and commission of the EgyptAir hijacking, and that the lead ANO terrorist operative, Omar Ali Rezaq, was trained and supported by the Syrian defendants. The Court finds that the Syrian defendants intended that their support of the ANO would promote and cause extrajudicial killings of American citizens, as well as necessarily result in the property destruction of the EgyptAir airplane incidental to the goals and objectives of the Syrian defendants and the ANO terrorists. The Court finds that Syria's actions could not have occurred without the explicit authorization by then-Syrian President Hafiz al-Asad. Accordingly, the Court will enter judgment and grant an award of damages on behalf of the plaintiffs against the Syrian defendants as set forth below.

## III.   STATEMENT OF THE CASE

Plaintiffs brought this action pursuant to the provisions of the Foreign Sovereign Immunities Act ("FSIA"), codified at 28 U.S.C. § 1602, *et seq.*[2] The Syrian defendants were served with process on June 28, 2003.[3] The Syrian defendants have neither answered nor

---

[2] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

[3] Service upon each of the Syrian defendants in Baker was perfected under 28 U.S.C. § 1608(a)(3) through delivery of the required documents (accompanied by Arabic translations) to the Head of the Ministry of Foreign Affairs via international courier service, evidenced by a June 30, 2003 letter from the international courier service indicating that the shipment

appeared.

A five-day hearing on liability and damages was held, commencing on May 3, 2010.[4]
During the hearing, this Court accepted evidence in the form of, *inter alia*, live testimony, live
video-link testimony, affidavit, *de bene esse* deposition, and original documentary evidence. The
Court also accepted credible expert testimony from eight well-qualified experts on various
subjects related to the issues pending before the Court in this matter.[5] Accordingly, this Court

---

[4] containing two copies of the summons and complaint and a notice of suit, together with a
translation of each into the official language of the foreign state was signed for by "Rana" at
the Syrian Ministry of Foreign Affairs for the defendants on June 28, 2003. Certificate, <u>Baker
v. Great Socialist People's Libyan Arab Jamahiriya</u>, No. 03-CV-749 (D.D.C. Sept. 5, 2003),
Docket No. 9. On February 29, 2008, Judge Kessler ordered that the Baker complaint be
amended to include plaintiffs' § 1605A claims, and that, in accordance with the enactment of
28 U.S.C. § 1605A, no separate service was necessary, as no new claims were asserted. <u>Order</u>,
<u>Baker v. Great Socialist People's Libyan Arab Jamahiriya</u>, No. 03-CV-749 (D.D.C. Feb. 29,
2008), Docket No. 65. The issues surrounding service of process of an already-existing claim
under 28 U.S.C. § 1605A will be addressed at greater length in the Conclusions of Law section,
*infra*.

[4] The hearing transcripts are separately docketed for each day of the hearing, from May 3 (day 1)
to May 7 (day 5), 2010. Citations to the transcript are identified as "name, T-day #-page," *i.e.*,
witness name, T-day 1 to 5-page number.

[5] The experts accepted by the Court are as follows:

<u>Marius Deeb, Ph.D.</u> - Professor Deeb was accepted as an expert witness by this Court
concerning the following topics: the Syrian government, Syrian government structure, Syrian
government's foreign policy, the Syrian government's past and continuing active support for
terrorism, including but not limited to the Syrian government's designation as a State Sponsor
of Terrorism and the Syrian government's support of the Abu Nidal terrorist organization,
which committed (a) the EgyptAir Flight 648 hijacking, and separately (b) the Rome and
Vienna Airport attacks one month later. (Deeb, T-2-196-197).

<u>Patrick Lang</u> - Col. Lang was accepted as an expert witness by this Court in the fields of
terrorism, counterterrorism, Middle Eastern affairs, and politics. He also rendered his opinion
on the sponsorship by Syria of terrorism, Syria as a designated State Sponsor of Terrorism,
Syria's sponsorship of the Abu Nidal Organization, a Foreign Terrorist Organization, and the
terrorist hijacking of Egypt Air Flight 648, committed on November 23, 1985 by the Abu Nidal

makes the following findings of fact and conclusions of law.

## IV.    FINDINGS OF FACT

### A.    The EgyptAir Flight 648 Hijacking

1.    On November 23, 1985, plaintiffs Baker, Pflug, and Rogenkamp, each of whom were American nationals, boarded EgyptAir Flight 648, which departed Athens at 9:05 pm Athens time. (Baker, T-2-47; Pflug, T-1-33; Rezaq, Pltf's Exh. 34 at 2741; Pltf's Exh.

---

Organization with Syrian sponsorship and separately the Rome and Vienna Airport attacks of December 27, 1985, committed by the Abu Nidal Organization with Syrian sponsorship. (Lang, T-2-122).

David Long, Ph.D. – Dr. Long was accepted as an expert witness by this Court regarding terrorism, counterterrorism, Middle Eastern affairs, and politics. He also testified as to the sponsorship by Syria of terrorism, its sponsorship of ANO, the Abu Nidal Organization, and the commitment by the Abu Nidal Organization with Syrian sponsorship of the hijacking of EgyptAir Flight 648, and separately the Rome and Vienna Airport attacks. (Long, T-3-199.)

James Markham, Ph.D. - Dr. Markham was accepted as an expert witness by this Court in the field of forensic economics. He was also deemed qualified to testify regarding the damage calculations for each of the killed or injured plaintiffs. (Markham, T-4-105).

Ambassador Robert Oakley - Ambassador Oakley was accepted as an expert witness by this Court in the fields of terrorism, counterterrorism, Middle Eastern affairs, politics, and Syria's sponsorship of the Abu Nidal Organization prior to, during, and following the EgyptAir Flight 648 hijacking, and Rome and Vienna Airport attacks. (Oakley, T-4-10).

Yoram Schweitzer, Ph.D. - Dr. Schweitzer was accepted as an expert witness by this Court in the fields of terrorism, counterterrorism, Middle Eastern affairs, politics, and Syria's sponsorship of the Abu Nidal Organization prior to, during, and following the EgyptAir Flight 648 hijacking, and Rome and Vienna Airport attacks. (Schweitzer, T-4-30).

Jack Spector, Ph.D., M.D. - Dr. Spector was accepted as an expert witness by this Court in the field of clinical neuropsychology. (Spector, T-3-19).

Gary K. Stimac, M.D., Ph.D. - Dr. Stimac was accepted as an expert medical witness by this Court. Dr. Stimac gave testimony concerning Baker's traumatic head injuries and their direct link to being shot execution style by Omar Rezaq during the hijacking. Dr. Stimac also testified that, "based upon [his] review of the MRI findings, available records of Mr. Baker, and [his] expertise, it [was his] opinion to a reasonable degree of medical certainty that the MRI abnormalities are the result of the physical injuries that Mr. Baker sustained during the hijacking on November 23rd, 1985." (Stimac, T-2-100; Stimac, Pltf's Exh. 33).

35.)

2.  EgyptAir Flight 648 was scheduled to fly directly to Cairo from Athens. (Baker, T-2-47; Pltf's Exh. 3.)

3.  Approximately 10 minutes after leveling off, the plane was hijacked. (Baker, T-2-47-48.)

4.  One of the hijackers began to taunt passengers on board by attempting to pull a pin out of a hand grenade while simultaneously brandishing a firearm. (Baker, T-2-48-51.)

5.  During this time, Pflug was struck over the head with a gun by a hijacker. (Pflug, T-1-34.)

6.  At 8:28 pm Malta time, three ANO hijackers, including Omar Mohammed Ali Rezaq, took control of the EgyptAir airliner. (Baker, T-2-84; Pflug, T-1-35; Pltf's Exh. 3.)

7.  The ANO hijackers directed an EgyptAir flight attendant to go onto the aircraft intercom and say, "[w]e're being hijacked by the Egypt Revolution, and if you do what you are told, you will not get hurt." (Pflug, T-1-36.)

8.  After taking control of EgyptAir Flight 648, the ANO hijackers began searching the passengers, collecting their passports and reseating them. (Baker, T-2-5; Pflug, T-1-39.)

9.  The hijackers worked their way from the front of the plane to the back of the plane. (Pflug, T-1-39.)

10. Approximately thirty minutes after taking control of the plane, at approximately 9:00 pm Malta time, there was a shootout between an EgyptAir sky marshal (who was onboard the aircraft) and the hijackers. (Baker, T-2-52, 84; Pflug T-1-39; Pltf's Exh.3.)

11. The aircraft's fuselage was punctured by bullets, and the plane rapidly descended. (Baker, T-2-52-53; Pflug, T-1-41.)

12. Because of the need for fuel, EgyptAir Flight 648 landed at Malta's Luqa Airport at 10:16 pm. (Baker, T-2-84; Pltf's Exh. 3; Pflug, T-1-50; Baker, T-2-55.)

13. Shortly after landing in Malta, stairs were brought to the EgyptAir aircraft, and a medic was allowed onboard. (Baker, T-2-56.)

14. The medic certified that one of the hijackers shot during the shootout with the Egyptian air marshal was dead. (Baker, T-2-56.)

15. While the medic was taking the injured Egyptian air marshal off of the aircraft, Rezaq shot the air marshal in the back. (Baker, T-2-56.)

16. The hijackers then demanded fuel, and indicated that they were prepared to execute

passengers in order to ensure their demands were met. (Lang, T-2-157.)

17. As the hijackers were waiting for the fuel to arrive, they called forward and released some of the passengers based on their nationalities, as determined from their respective passports. (Baker, T-2-57.)

18. The hijackers threatened to shoot a passenger every fifteen minutes if they did not receive fuel. (Pltf's Exh. 34 at 2783.)

19. Shortly after releasing some of the passengers, Omar Rezaq summoned the first Israeli passenger, Tamar Artzi, and shot her in the head, throwing her body off the aircraft onto the tarmac. It was midnight Malta time on November 24, 1985. (Baker, T-2-84; Pltf's Exh. 3.)

20. Pflug was seated next to an Australian man, who told Pflug that the first Israeli woman who was shot was moving on the tarmac. (Pflug, T-1-51.)

21. Pflug thought to herself (of the woman), "Whatever you do, don't move, just play dead." (Pflug, T-1-51.)

22. The hijackers, having discovered that the Israeli woman was still alive, shot her again while she lay on the tarmac. (Pflug, T-1-51).

23. Approximately fifteen minutes after Artzi was shot, at 12:15 am, a second Israeli passenger, Nitzan Mendelson, was dragged to the front of the aircraft and shot in the head by Omar Rezaq. (Baker, T-2-85; Pltf's Exh. 3.)

24. Her body was also thrown from the aircraft onto the tarmac. (Baker, T-2-58.)

25. After the two Israeli women were shot, Baker commented to a woman sitting next to him that he was going to be next. (Baker, T-2-58.)

26. Approximately 15 minutes after shooting the two Israeli passengers, the hijackers called the three American passengers—Baker, Pflug, and Rogenkamp—to the front of the plane. (Pflug, T-1-52; Baker, T-2-59.)

27. The three American passengers' hands were tied behind their backs with neckties, and they were seated in the first row on the starboard side of the plane. (Baker, T-2-59; Pflug, T-1-52.)

28. Shortly before 12:30 am Malta time, Baker was taken to the door of the aircraft. (Baker, T-2-60; Pltf's Exh. 3).

29. While standing at the door, Baker overheard a radio transmission broadcast from the Malta control tower: ""There is to be no more killing. The fuel is on its way." (Baker, T-

2-60.)

30.    Baker was allowed to sit down again. (Baker, T-2-60.)

31.    Four and a half hours after the EgyptAir Flight 648 aircraft departed Athens, and four hours into the hijacking, after having witnessed the execution-style shooting of two other passengers, Baker was again brought to the door of the aircraft.  Shortly after 12:30 am Malta time, he was shot point-blank in the head by Rezaq. (Baker, T-2-60-61, 85; Pflug, T-1-53; Pltf's Exh. 3.)

32.    Baker's body was thrown down the stairway to the airplane.  He landed approximately halfway down the stairs. (Baker, T-2-61.)

33.    Baker heard two men coming down the stairs.  They carried his limp body back up to the aircraft. (Baker, T-2-61.)

34.    The hijackers then threw him out of the door of the aircraft a second time.  This time, he landed on the tarmac. (Baker, T-2-61.)

35.    Baker played dead on the tarmac until he was sure that the hijacker had gone back inside the plane. (Baker, T-2-61.)

36.    Baker managed to escape by sneaking away on the tarmac and running underneath the hijacked airplane. (Baker, T-2-81.)

37.    As Baker ran across the tarmac in the dark, he saw someone stand up in a grassy area to his left and point a rifle at him. (Baker, T-2-62.)

38.    Baker turned around to show the person that he had his hands tied behind his back, in order to show that he was not a threat and to avoid being shot. (Baker, T-2-62, 82.)

39.    The person pointing the rifle turned out to be a British soldier, who may have thought Baker was a terrorist running from the airplane. (Baker, T-2-82.)

40.    Baker was taken by ambulance to a Maltese hospital. (Baker, T-2-63.)

41.    Baker was hospitalized at St. Luke's Hospital G'Mangia, Malta, where he was treated for four (4) days for the gunshot wound to his head and other injuries which he suffered. (Pltf's Exh. 31B.)

42.    At 4:30 am Malta time, eight and one-half hours after the EgyptAir flight 648 aircraft had departed Athens and eight hours into the hijacking, and after witnessing the execution-style shooting of three other passengers, a second American passenger, Rogenkamp, was brought to the front of the aircraft, where she was shot in the head and killed by Rezaq. (Pflug, T-1-54, 56-57; Pltf's Exh. 3.)

43.     Rogenkamp's body was also thrown onto the tarmac after the shooting. (Pflug, T-1-57.)

44.     Rogenkamp's body was taken to the Malta Hospital, where she was later identified by Baker, who was being treated there. (Baker, T-2-64.)

45.     At 10:00 am Malta time, fourteen hours after the EgyptAir flight 648 aircraft had departed Athens and thirteen and one-half hours into the hijacking, and after witnessing the execution-style shooting of four other passengers, Pflug, the third American passenger onboard, was called forward and shot in the head by Rezaq. (Pflug, T-1-57-60; Pltf's Exh. 3.)

46.     Like the other Israeli and American victims who were shot in the head, Pflug was thrown onto the tarmac. (Pflug, T-1-61.)

47.     Pflug lay on the tarmac, pretending to be dead while going in and out of consciousness, for approximately five hours. (Pflug, T-1-62.)

48.     Medics arrived at the EgyptAir aircraft, and, believing Pflug to be dead, recovered her body and placed her in an ambulance to take her to a morgue. (Pflug, T-1-66.)

49.     After the medics realized that Pflug was alive, she was taken to St. Luke's Hospital in G'Mangia, Malta, where she was treated for her injuries. (Pflug, T-1-66-67.)

50.     Pflug subsequently underwent brain surgery, and has endured a lifetime of recovery, pain, suffering, and physical and emotional trauma.  (Pflug, T-1-53; Pltf's Exh. 4A.)

51.     On the second day of the hijacking, at 8:15 pm Malta time, Egyptian commandos stormed the hijacked airplane in an attempt to rescue the remaining passengers and bring about the end of the hijacking. (Lang, T-2-170-71.)

52.     As a result of this rescue attempt, the aircraft was almost completely destroyed, and approximately 60 passengers were killed. (Pltf's Exh. 3; Lang, T-2-170-172; Baker, T-2-86.)

   **B.      The Abu Nidal Organization Perpetrated the EgyptAir Flight 648 Hijacking**

53.     Omar Ali Rezaq, the sole surviving hijacker, was injured in the rescue attempt by Egyptian commandos, and was subsequently treated at a Maltese hospital. (Pltf's Exh. 34 at 2567-2571.)

54.     Rezaq was tried and convicted in Malta and served time in prison. (Pltf's Exh. 34 at 2792-2793.)

55.     Subsequent to his release from the Malta prison, Rezaq was tried in Washington, DC, before Judge Royce C. Lamberth in the U.S. District Court for the District of Columbia.

(Ex 34.)

56.   Rezaq's criminal trial was styled <u>United States of America v. Omar Mohammed Ali Rezaq</u> No. 93-CR-284. (Pltf's Exh. 34.)

57.   During his criminal trial, Rezaq did not deny the fact that he got on EgyptAir Flight 648, that he went into the cockpit, that he intentionally forced the plane to divert Malta, and that he shot EgyptAir Flight 648 passengers on the ground in Malta. (Pltf's Exh. 34 at 2781.)

58.   During his criminal trial, when asked if Rezaq remembers shooting people on EgyptAir Flight 648, Rezaq testified, "[its] [s]omething I cannot forget." (Pltf's Exh. 34 at 2782.)

59.   Subsequently, in a signed affidavit, Omar Rezaq admitted that he was convicted of air piracy as the terrorist who hijacked EgyptAir Flight 648. (Pltf's Exh. 35.)

60.   Rezaq admitted that the operation had been carried out by the ANO, of which he was a member. (Pltf's Exh. 35, Pltf's Exh. 34.)

61.   Rezaq also admitted that he was trained in an ANO training camp in the Syrian-controlled Baaka Valley. (Pltf's Exh. 35, Pltf's Exh. 34.)

62.   Rezaq also admitted that this terrorist hijacking took place at the instigation of and with the support of the governments of Syria and Libya. (Pltf's Exh. 34, Pltf's Exh. 35.)

63.   Omar Rezaq is currently serving a life sentence at the Federal Maximum Security Prison, ADX, Federal Bureau of Prisons, in Florence, Colorado, having been convicted of air piracy as a result of his involvement as an ANO terrorist in the EgyptAir Flight 648 hijacking on November 23, 1985. (Pltf's Exh. 35.)

**C.    The Abu Nidal Organization is a Foreign Terrorist Organization**

64.   The ANO was established and led by Sabri al-Banna, a/k/a Abu Nidal. (Lang, T-2-141.)

65.   Abu Nidal was originally a member and operative of Yasser Arafat's Fatah organization and a part of the Palestine Liberation Organization ("PLO"). (Deeb, T-2-203-204.)

66.   In October 1974, when Abu Nidal was serving as Arafat's Fatah organization representative in Baghdad, Iraq, he broke away from the movement and formed his own, more radical organization, which he called the Fatah-Revolutionary Council, a.k.a. the Abu Nidal Organization. (Deeb, T-2-203.)

67.   Abu Nidal broke away from Arafat in opposition to Arafat's support of the Middle East peace process. (Deeb, T-2-208-209.)

68.     Abu Nidal was a violent individual, and the ANO was brutal; their documented methodology for the commission of terrorist attacks was bloodshed. (Long, Pltf's Exh. 52 at 2.)

69.     During the relevant period surrounding the November 23, 1985 hijacking of EgyptAir Flight 648 and the December 27, 1985 attacks at both the Leonardo da Vinci Airport at Rome, Italy and the Schwechat Airport at Vienna, the ANO became one of the most sophisticated terrorist groups of its day, with a global network of operations. (Long, Pltf's Exh. 52 at 2.)

70.     One of the primary reasons that the ANO was so effective was the high level of internal security Abu Nidal achieved within his organization. (Long, Pltf's Exh. 52 at 2.)

71.     Compartmentalization within the ANO was rigid, both horizontally and vertically; personnel were organized into small cell groups, with minimal interaction between members. (Pltf's Exh. 52 at 2.)

72.     The ANO was run like a commercial enterprise, with different departments, including secret service, military, archives, and foreign relations. (Badra, Pltf's Exh. 34 at ¶10.)

73.     ANO terrorists used assumed names, along with matching forged identification and travel documents; the names were changed constantly so that no one could be sure of the real names of ANO members. (Pltf's Exh. 52 at 2.)

74.     The ANO would not have been able to operate or conduct the attacks without the support of foreign governments. (Lang, T-2-175.)

75.     The ANO was known by the United States government in 1985 and 1986 to be a brutal, violent, and dangerous terrorist organization, and was subsequently designated as a Foreign Terrorist Organization ("FTO") by the U.S. Department of State. (Deeb, T-2-226.)

76.     According to the FTO list released by the Department of State on November 24, 2010, ANO remains designated as a FTO. (Pltf's Exh.43.)[6]

### D.     Syria Sponsored and Supported the Abu Nidal Organization

77.     The head of the Syrian Air Force Intelligence, General Muhammad al-Khuli, in his official capacity, invited Abu Nidal and his organization to move to Syria in January 1981. (Deeb, T-2-206-208.)

78.     When al-Khuli officially invited the ANO to be based in Syria, he was following the orders of Syrian President Hafiz al-Asad. (Deeb, T-2-206-208.)

---

[6] http://www.state.gov/s/ct/rls/other/des/123085.htm (last visited March 1, 2011).

79.  Prior to the hijacking and continuing to the present, Syria has been run as a police state under the al-Asad family. (Deeb, T-2-191.)

80.  While the ANO was based in Syria, its actions and terrorist operations would not have been possible without the full knowledge and support of the Syrian regime. (Deeb, T-2-207.)

81.  In the beginning of 1983, the ANO established itself more concretely in Syria with physical headquarters and bases for training.  This coincided with the exponential growth of ANO attacks around the world. (Deeb, T-2-228.)

82.  ANO operations expanded to include attacks in the greater Middle East, Turkey, Pakistan, and Western Europe. (Deeb, T-2-228.)

83.  The ANO's establishment of a base of operations in Syria in 1983 also marked a dramatic increase in the number of ANO terrorist attacks; more than a dozen ANO attacks in 1984, and twice that number in 1985. (Pltf's Exh. 47.)

84.  The extensive support and infrastructure provided by the Syrian defendants enabled the ANO to expand its scope of operations, resulting in more terrorist attacks. (Pltf's Exh. 52 at 4.)

85.  The ANO, from 1982 through at least the fall of 1985, trained its terrorist squads in the Syrian-controlled Baaka Valley in Lebanon, maintained safe houses and headquarters in Damascus, Syria, and operated under the watchful eye and with the permission of the Syrian government and the Syrian defendants. (Deeb, T-2-212-14; Lang, T-2-143-44.)

86.  Syria provided the ability for ANO to train and house and dispatch its operatives, who were also given passage to return to Syria or the Syria-controlled Baaka Valley in Lebanon for further terrorist training and operations. (Lang, T-2-144;  Rezaq, Pltf's Exh. 34, 2756, 2763-2764, 2769; Ibrahim, Pltf's Exh. 36.)

87.  Both before and after the November-December 1985 time period during which the EgyptAir hijacking and the Rome and Vienna Airport attacks occurred, Syria provided logistical support to the ANO including, but not limited to, permitting the ANO to maintain offices and safe houses in Syria, maintaining training camps in Syria-controlled territory including the Baaka Valley in Lebanon, and providing identification and travel documents to ANO operatives. (Lang, T-2-143-145; Oakley, T-4-25; Rezaq, Pltf's Exh. 34 at 2756, 2763-2764, 2769; Ibrahim, Pltf's Exh. 36.)

88.  Syria also allowed the ANO to move about freely in Syria and in Syria-controlled Lebanon and in this regard permitted ANO operatives to travel to and from both the Damascus international airport and the Beirut, Lebanon airport. (Deeb, T-2-218; Lang, T-2-155.)

89.     Moreover, Syria also permitted ANO agents the freedom to travel on military highways between training camps in Syria-controlled Lebanon and Damascus without passport control. (Lang, T-2-144.)

90.     Surviving ANO terrorists from the EgyptAir hijacking and the Rome and Vienna Airport attacks have corroborated, through sworn depositions and/or filed affidavits admitted into evidence by the Court, Syria's specific logistical support and sponsorship of the ANO during the time period surrounding the attacks. (Pltf's Exh. 35; Pltf's Exh. 36; Pltf's Exh. 37; Pltf's Exh. 38.)

91.     Syria participated in the planning, including the timing and the methodologies, and the operations involved in both the EgyptAir hijacking and the Rome and Vienna Airport attacks. (Deeb, T-2-216-217.)

92.     The Syrian government, both directly and acting through Syrian Air Force Intelligence, provided support to the ANO organization, and specifically sponsored the ANO EgyptAir hijacking and the Rome and Vienna Airport attacks. (Lang, T-2-145.)

93.     The EgyptAir hijacking and the Rome and Vienna Airport attacks could not have taken place without Syria's direct support for the ANO. (Lang, T-2-145; Deeb, T-2-229; Long, Pltf's Exh. 52 at 4; Schweitzer, Pltf's Exh. 53 at 35; Schweitzer, Pltf's Exh. 54 at 35.)

94.     The ANO was materially and substantially supported in its terrorist activities by the Syrian defendants beginning in 1981-1983, and continuing through and including the November 1985 EgyptAir hijacking and the December 1985 Rome and Vienna Airport attacks.

## E.      Syria is a State Sponsor of Terrorism

95.     Prior to and during the relevant period surrounding the hijacking of EgyptAir Flight 648 and the Rome and Vienna Airport attacks, terrorism was an integral foreign policy tool for the Syrian regime. (Deeb, T-2-197; Lang, T-2-128.)

96.     Syria became actively and directly involved in sponsoring terrorist activities beginning in the mid-1970s. (Deeb, T-2-197.)

97.     Historically, Syria has provided material support to terrorist groups primarily in order to achieve foreign policy goals, such as pushing the United States and its allies out of the region. (Deeb, T-2-198.)

98.     Syria opposed the Middle East peace process between Israel and Egypt. (Schweitzer, Pltf's Exh. 54.)

99.     Syrian-sponsored terrorist activities were, and continue to be, primarily directed against any entity supportive of that process, including moderate Arab states such as Egypt, pro-

Yassir Arafat Palestinian groups, and U.S. and Israeli targets. (Deeb, T-2-198; Pltf's Exh. 54 at 31-32.)

100. Syria supported the ANO's operations against Arab countries that supported the Israel-Egypt peace treaty. (Schweitzer, Pltf's Exh. 54.)

101. In this regard, Syria has used terrorist groups as a means of achieving foreign policy goals without resorting to conventional methods of warfare, which it could not, and still cannot, afford to wage against either Israel or the United States. (Deeb, Pltf's Exh. 50 at 2, 7.)

102. As a result of its past support of terrorism, Syria was among the first countries designated in 1979 by the United States Department of State as a State Sponsor of Terrorism. (Oakley, T-4-11.)

103. Syria was designated as a State Sponsor of Terrorism on December 29, 1979. (Pltf's Exh. 41.)

104. Syria, as a result of its ongoing, current and continuous sponsorship of terrorism, today remains designated by the State Department as a State Sponsor of Terrorism. (Pltf's Exh. 41.)

105. During the period encompassing the EgyptAir hijacking of November, 1985, and the Rome and Vienna Airport attacks of December, 1985, Syria remained one of the primary state sponsors of terrorism. (Oakley, T-4-9.)

106. During the same time period, the United States considered Syria one of the worst sponsors of terrorism in the world. (Oakley, T-4-22.)

107. During the relevant time period, Syria began to increasingly rely on terrorist groups comprised of non-Syrians in order to deflect detection of Syria's support and liability for the actions of its terrorist surrogates. (Deeb, T-2-201.)

108. During the relevant period surrounding the EgyptAir hijacking and the Rome and Vienna Airport attacks, President Hafiz al-Asad ruled Syria under an authoritarian government, whereby all organs of the state were directly under his control. (Deeb, T-2-214, 216.)

109. One of the primary organizations al-Asad utilized to sponsor terrorist organizations, such as the ANO, was the Syrian Air Force Intelligence agency, Idarat al-Mukhabarat al-Jawiyya. (Oakley, T-4-13.)

110. The Syrian Air Force Intelligence agency acted more as a presidential intelligence service than an instrumentality of the Air Force, and was of paramount importance because it functioned as the highest intelligence organization in Syria. (Deeb, T-2-206, 226.)

111. The head of the Air Force Intelligence, General Muhammad al-Khuli, was the most powerful intelligence chief within Syria. (Deeb, T-2-206-208.)

112. Syria remains a major sponsor of terrorism today. (Deeb, T-2-197.)

113. At present, according to the testimony received by the Court from Dr. Deeb, Syria, as a state sponsor of terrorism, spends between US $500,000,000 (at a minimum) and US $700,000,000 annually on terrorism-related expenditures. (Deeb, T-2-235.)

114. Syria's current and ongoing support of international terrorism includes, but is not limited to, providing material support to HAMAS and Hezbollah, each of which have been designated by the U.S. Department of State as Foreign Terrorist Organizations. (Deeb, T-2-160-161.)

**F.     The Plaintiffs are American Victims of the EgyptAir Flight 648 Syrian-Sponsored ANO Hijacking**

*1.     Patrick Baker and Family*

115. Baker was born in White Salmon, Washington on July 13, 1957. (Pltf's Exh. 28.)

116. Baker was born a United States citizen and has remained a United States citizen from the time of his birth through the present. (Baker, T-2-34.)

117. Baker's biological father is Jerry Baker. (Baker, T-2-37; Pltf's Exh. 28.)

118. Baker's biological mother is Lois Baker. (Baker, T-2-37; Pltf's Exh. 28.)

119. Baker's siblings are David Baker, Craig Baker, and Stacie Baker. (Baker, T-2-38.)

120. David Baker is now deceased. (Pltf's Exh. 63.)

121. Craig Baker serves as the personal representative of the estate of David Baker. (Pltf's Exh. 64; Baker, T-3-113.)

122. Baker's parents and siblings were all born United States citizens. (Baker, T-2-37-40.)

123. Baker's parents have remained United States citizens from the time of their respective births through the present. (Baker, T-3-130-131; Baker, T-3-148; Baker, T-2-37-40.)

124. Craig and Stacie Baker have remained United States citizens from the time of their respective births through the present. (Baker, T-2-39-40; Baker, T-3-110; Baker, T-3-161.)

125. David Baker remained a United States citizen from the time of his birth through the time of his death. (Baker, T-2-39; Baker, T-3-112-113.)

126.    Baker graduated from Washington State University with a Bachelor of Science degree in General Biology in 1980. (Baker, T-2-35-36.)

127.    Lois Baker, Patrick's mother, had a master's degree in medical technology, and spent her career in laboratories and hospitals. (Baker, T-3-131-32.)

128.    Baker had plans to attend graduate school and pursue a graduate degree. (Baker, T-2-36.)

129.    With the aim of paying off student loans, Baker worked at an aluminum plant for three years. (Baker, T-2-40-41.)

130.    Prior to the EgyptAir Flight 648 hijacking, Baker also worked as a fish processor. (Baker, T-2-34.)

131.    As a result of being shot in the head by ANO terrorist Omar Rezaq during the EgyptAir hijacking, Baker suffered severe, permanent, painful, life-long injuries, including, but not limited to, a laceration wound head trauma, concussion, and wounds to his body from twice being thrown from the aircraft. (Pltf's Exh. 31.)

132.    To treat these injuries, Baker was hospitalized at St. Luke's Hospital G'Mangia, Malta for four days. (Pltf's Exh. 31B.)

133.    Baker's treatment included, but was not limited to, the treatment of his gunshot wound to the back/side of his head, the treatment of the contusions and abrasions on his body, and monitoring for the possibility of brain injury. (Pltf's Exh. 30; Pltf's Exh. 31.)

134.    In addition to the severe physical injuries suffered by Baker, prior to being shot and tossed from the plane, Baker suffered emotional trauma and mental anguish throughout the many hours of the horrific hijacking ordeal upon which he has continuously reflected in the decades since it occurred. (Baker, T-2-77.)

135.    As a result of being a victim of the EgyptAir Flight 648 hijacking, Baker suffers severe emotional injuries including, but not limited to, post-traumatic stress disorder. (Pltf's Exh. 57B at 7.)

136.    Baker also suffered permanent brain injuries as a result of being shot in the head during the EgyptAir hijacking. (Pltf's Exh. 33.)

137.    As a result of the injuries, both psychological and physical, Baker was unable to obtain a master's degree as initially planned. (Baker, T-2-91.)

138.    Baker retreated to a psychological "comfort zone" after the hijacking and shooting, and pursued a line of work in the fishing industry, which tended to be socially isolated, to cope with the after-effects of his injuries and experience of being a hijacking victim. (Baker, T-2-91-92; Pltf's Exh. 57B at 4.)

139. The Court heard testimony from Baker himself, as well as from his father Jerry Baker, his mother Lois Baker, and his two living siblings, Stacie and Craig Baker, the latter of whom also testified as administrator of the estate of Patrick Baker's eldest brother, David Baker. (Patrick Baker, T-2-32; Jerry Baker, T-3-147; Lois Baker, T-3-128; Stacie Baker, T-3-159; Craig Baker, T-3-108.)

140. According to the testimony before the Court, the Baker family was "very close." (Baker, T-3-115.)

141. Patrick was close with his parents and his siblings. (Baker, T-3-135.)

142. As the Baker siblings were close in age, they participated in many activities together while growing up. (Baker, T-3-162.)

143. The Baker family would always celebrate holidays together while growing up, and even after the Baker children left home. (Baker, T-3-115; Baker, T-3-151.)

144. Baker's family kept in touch with Patrick when he went off to college. (Baker, T-3-136-137; Baker, T-3-116-117; Baker, T-3-152; Baker, T-3-164.)

145. Patrick Baker was described in testimony as being "easygoing" and "very open," with a "huge sense of adventure" prior to his ordeal as a victim of the EgyptAir hijacking. (Baker, T-3-117; Baker, T-3-135.)

146. Lois Baker testified that she and her husband received a call from the State Department notifying them that their son Patrick had been shot. (Baker, T-3-138.)

147. Lois Baker testified, "I had to believe [Patrick] was alive . . . it was such an upsetting time. We didn't know if he was really alive or dead . . . ." (Baker , T-3-139.)

148. Jerry Baker was also concerned about his son, and "if he was ok." (Baker, T-3-155.)

149. Craig Baker testified that he was "terrified" when he learned that his brother Patrick had been shot in the head as a result of the EgyptAir hijacking, a sentiment that Craig testified was shared by David Baker, as they did not exactly know about Patrick Baker's condition. (Baker, T-3-121.)

150. Additionally, Stacie Baker testified that she was "in shock" when she learned the news that Patrick had been shot. (Baker, T-3-167.)

151. Upon returning to the United States following the EgyptAir hijacking, Baker was described as being "quiet," and did not talk much, which his brother Craig testified was not at all like he used to be. (Baker, T-3-123; Baker, T-3-169.)

152. Lois Baker testified that Patrick would be easily angered or nervous following his return

home, which was very out of character. (Baker, T-3-143.)

153. Jerry Baker described his son following his return as "more subdued" and "serious." (Baker, T-3-157.)

154. Following Baker's return to Washington state, he stayed with his brother Craig for a week, who recalls hearing Patrick having nightmares and groaning in his sleep. (Baker, T-3-123-124.)

155. Stacie Baker testified that it was really hard to see Baker in the condition he was in following his return to Washington, and that she was extremely worried about him. (Baker, T-3-172.)

156. Today, Baker's family sometimes worries that "something may be wrong with Patrick" which has yet to manifest itself. (Baker, T-3-144-145; Baker, T-3-158.)

157. Lois Baker testified that it was very hard for her to accept that her son was a victim of the EgyptAir hijacking. (Baker, T-3-145.)

158. Lois Baker testified, "I had feelings of how horrible it was for everybody on board, not just Patrick . . . it's always been there in the back of our minds, everything that's happened to him." (Baker, T-3-145.)

159. Stacie Baker testified that one of the most difficult aspects was watching not only what had happened to her brother Patrick, but how it affected her parents. (Baker, T-3-174.)

### 2. *Scarlett Marie Rogenkamp and Family*

160. Rogenkamp was born in Everett, Washington on March 26, 1947. (Pltf's Exh. 11.)

161. At the time of her murder, Rogenkamp was a United States citizen. (Pltf's Exh. 12.)

162. Rogenkamp's biological father was Vernon Peterson. (Pltf's Exh. 11.)

163. Rogenkamp's biological mother was Hetty Peterson, whose birth name was Hetty Messink. (Ex 11; Henry, T-1-121-122.)

164. Rogenkamp's siblings are Patricia Henry, Katherine Doris, Paul Peterson, and Michelle Holbrook. (Henry, T-1-115.)

165. Patricia Henry currently serves as the executor of Rogenkamp's estate. (Pltf's Exh. 13.)

166. Vernon Peterson was born a United States citizen and remained a United States citizen until his death. (Peterson, T-2-26.)

167. Hetty Peterson became a naturalized United States citizen on November 17, 1950, and

remained a United States citizen from that time until her death. (Pltf's Exh. 16; Henry, T-1-108.)

168. Rogenkamp's siblings were all born citizens of the United States, and have remained United States citizens from the time of their respective births through the present. (Henry, T-1-104; Pltf's Exh. 22; Pltf's Exh. 23; Holbrook, T-3-9.)

169. Rogenkamp attended one year of college at The College of William & Mary in Virginia, subsequently completing her undergraduate education at the University of California, Long Beach, where she received a Bachelor of Arts degree. (Henry, T-1-129.)

170. Rogenkamp was a civilian employee of the United States Air Force for approximately ten years and worked in the capacity of a Property Management Specialist, rising to the level of a GS-12 within the Air Force civilian service. (Henry, T-1-129-130.)

171. Rogenkamp no doubt suffered as she endured the hijacking, watched Rezaq shoot other passengers in the while head knowing that she was next, was shot herself and endured physical pain, mental anguish, and great suffering, and subsequently died as a result of the gunshot to her head, which caused a mortal laceration to the brain. (Pltf's Exh. 12.)

172. Rogenkamp posthumously received a Purple Heart. (Pltf's Exh. 14.)

173. Present at trial were Rogenkamp's sisters, Michelle Holbrook and Patricia Henry, the latter of whom appeared both individually and as administrator of both Rogenkamp's and Rogenkamp's mother's, Hetty Peterson's, estates. (Holbrook, T-2-5; Henry, T-1-103.)

174. Also present at trial was Valerie Peterson, who serves as the administrator of the estate of Vernon Peterson, Rogenkamp's father. (Peterson, T-2-22.)

175. Rogenkamp's brother, Paul Peterson, and sister, Katherine Doris, testified by sworn affidavit. (Doris, Ex 22; Peterson, Pltf's Exh. 25)

176. As the oldest of four children, Rogenkamp was close to and made an effort throughout her life to spend time with and be supportive of her four siblings. (Doris, Pltf's Exh.22 at ¶¶ 12, 14, 15, 17; Peterson, Pltf's Exh. 25 at ¶¶ 11, 14; Holbrook, T-2-11, 17; Henry, T-1-125, 130).

177. Patricia Henry describes being "best friends" with her sister while growing up, and described their relationship as "close." (Henry, T-1-125.)

178. Henry described Rogenkamp as being very similar to her mother, Hetty Peterson, and noted that they enjoyed the same activities, especially when they were together. (Henry, T-1-131.)

179. Rogenkamp's mother visited her in Greece in September 1985, and they enjoyed

traveling together. (Henry, T-1-130.)

180. Her father, Vernon Peterson, was also "very close" with his eldest daughter. (Henry, T-1-120.)

181. Rogenkamp was a very accomplished woman, which made her family extremely proud. (Doris, Pltf's Exh. 22 at ¶¶ 11, 18.)

182. Immediately prior to the EgyptAir hijacking, Rogenkamp was continuing her ten-year service as a civil service employee in the United States Air Force, and at that time was stationed overseas in Athens, Greece. (Henry, T-1-129-130.)

183. Immediately following the EgyptAir hijacking, the wait for any confirmation that Rogenkamp indeed was among those killed added to the emotional trauma that the Peterson family suffered. (Doris, Pltf's Exh. 22 at ¶ 21.)

184. Her father never was able to find peace after her execution. (Peterson, T-2-31.)

185. The manner in which she was murdered compels her sister Michelle Holbrook to describe her murder not as a "murder," but instead as an "execution." (Holbrook, T-2-13.)

186. Certain members of Rogenkamp's family have also battled depression and undergone medical treatment to treat depression suffered as a direct result of her murder. (Doris, Pltf's Exh. 22 at ¶¶ 25, 26, 27; Peterson, Pltf's Exh. 23 at ¶¶ 25, 27.)

187. Her sister Katherine stated in her affidavit that she finds it very difficult to discuss the emotional impact of Scarlett's death on her, and the only way she could express her feelings about Rogenkamp's death was in writing. (Henry, T-1-113; Doris, Pltf's Exh. 22 at ¶ 8.)

188. Approximately three days after Rogenkamp's death, Katherine sought treatment at the hospital on the Camp Pendleton military base, where she was admitted through the emergency room and stayed for three days; she suffered from complications from asthma, shock, and emotional distress. (Doris, Pltf's Exh. 22 at ¶ 26.)

189. Katherine has been treated for depression by numerous doctors since her sister's death, and believes that some of her depression stems from her despondency following the event. (Doris, Pltf's Exh. 22 at ¶ 27.)

190. Rogenkamp's brother Paul stated in his affidavit that he finds it very difficult to discuss his sister's death, and lives a reclusive life because he finds it hard to be around people. (Henry, T-1-116; Peterson, Pltf's Exh. 23 at ¶ 8.)

191. Paul lived with Rogenkamp from 1974-76, shortly after he graduated from high school, at which point they became very close; she took care of Paul in lieu of their parents, who

were stationed overseas. (Peterson, Pltf's Exh. 23 at ¶¶ 10-11).

192.    Paul attended the California Maritime Academy for a period of time, and was proud to be on the path to civil maritime service, just as his sister served in the United States Civil Service for the Air Force. (Peterson, Pltf's Exh. 23 at ¶ 15.)

193.    Paul found attending his sister's funeral to be a very traumatic experience, and has been unable to attend any funeral since, including those for his parents. (Peterson, Pltf's Exh. 23 at ¶ 24.)

194.    Since Rogenkamp's death, Paul has sought treatment for substance abuse and depression, and has been admitted for rehabilitation for his substance abuse problems three times since 1992. (Peterson, Pltf's Exh. 23 at ¶ 25-27.)

195.    Paul is afraid to fly, and has found it difficult to pursue a career. (Peterson, Pltf's Exh. 23 at ¶ 28-29.)

196.    Rogenkamp was described in testimony as "beautiful," "outgoing," "confident," and a "free spirit." (Henry, T-1-126.)

197.    Her supervisor at the Air Force expressed the following in a condolence letter to her family:  "[N]o one who met Scarlett could fail to see her spirit and drive . . . her zest for life.  This zest radiated to touch others . . . oftentime to bring sunshine into our lives. You always knew where Scarlett stood; she stood up for what she thought was right." (Pltf's Exh. 15.)

            *3.      Jackie Nink Pflug and Family*

198.    Pflug was born in Houston, Texas on January 24, 1955. (Pltf's Exh. 1.)

199.    Pflug was born a United States citizen and has remained a United States citizen from the time of her birth through the present. (Pflug, T-1-18.)

200.    Pflug's biological father is Eugene Nink. (Pltf's Exh. 1.)

201.    Pflug's biological mother is Rylma Nink. (Nink, T-4-48-49.)

202.    Pflug's siblings are Mary E. Nink O'Donnell and Gloria Jo Nink. (Nink, T-4-49.)

203.    Pflug's father and siblings were all born United States citizens and have remained United States citizens from the time of their birth through the present. (Nink, T-4-48; O'Donnell, T-4-56; Nink, T-4-72.)

204.    Pflug's mother was born a United States citizen and remained a United States citizen until her death. (Nink, T-4-73.)

205. Pflug married Scott Pflug in July 1985. (Pflug, T-3-54.)

206. Scott Pflug was born a United States citizen and has remained a United States citizen from the date of his birth until the present. (Pflug, T-3-50.)

207. Jackie Pflug and Scott Pflug divorced three years after the EgyptAir Flight 648 hijacking. (Pflug, T-3-81.)

208. Jackie Pflug married Jim Olsen on May 25, 1996. (Olsen, T-4-39.)

209. Pflug and Olsen have one son, Tanner Olsen., who was born in August 1997. (Olsen, T-4-40; Pltf's Exh. 74.)

210. Pflug received her Bachelor of Science Degree from Sam Houston State in 1977. (Pflug, T-1-19.)

211. Pflug subsequently taught for four years, and then went back to school to receive a Master's of Science Degree from the University of Houston. (Pflug, T-1-19.)

212. Pflug specialized in the field of special education and, among other duties, performed testing on children to assess diagnostically specific learning disabilities. (Pflug, T-1-20-21.)

213. After teaching and working as a diagnostics specialist in the United States, Pflug worked abroad in the field of special education at schools in Norway and Egypt. (Pflug, T-1-22, 25.)

214. Pflug intended to pursue a doctorate program beginning in the summer of 1986, with the aim of earning the degree by the time she was forty years old. (Pflug, T-1-27.)

215. In November 1985, Jackie and Scott Pflug were living in Cairo, Egypt. (T-1-26.)

216. Scott Pflug was the volleyball coach at the school where he and Pflug worked in Cairo, and she accompanied him to Athens to attend a volleyball tournament in which the Cairo school was participating. (Pflug, T-1-27-28.)

217. Although Jackie Pflug was scheduled to depart Athens for Cairo on an earlier flight, she changed her flight so she could stay and watch the volleyball team compete in a higher round tournament game, ultimately changing her flight to EgyptAir Flight 648 on November 23, 1985. (Pflug, T-1-28-29.)

218. In addition to the severe physical injuries suffered by Pflug, prior to being shot and tossed from the plane, she suffered severe emotional anguish throughout the many hours of the horrific hijacking ordeal. (Pflug T-1-55-56; Pflug, T-1-57-62.)

219. As a result of being shot point-blank in the head by ANO terrorist Omar Rezaq during the EgyptAir hijacking, Pflug's physical injuries included, but were not limited to, an entry wound from the bullet to the right side of her head and damage to her skull and brain. (Pltf's Exh. 4A.)

220. The damage to Pflug's skull and brain required surgery to remove both the bullet and fragments of skull that the bullet pushed into her brain. (Pltf's Exh. 4A.)

221. The shooting and subsequent surgery left Pflug with a partially caved-in head, which was later somewhat corrected by another surgery to insert a metal plate in her head; as a result of the injury, she has diminished peripheral vision and significant visual perception problems. (Pflug, T-1-78-79; Pflug, T-1-73-76.)

222. Pflug was unable to count money or tell time after she was shot. (Pflug, T-1-79.)

223. When Pflug attempted to return to teaching, she struggled with the day-to-day tasks, and the children made fun of her because she was bald after her brain surgeries. (Pflug, T-1-80, 95.)

224. Eventually, parents complained that someone with as low a reading level as she now possessed should not be teaching, and Pflug was asked not to return. (Pflug, T-1-79.)

225. Pflug describes teaching prior to and at the time of the hijacking as having been "the love of my life next to my former husband," but the difficulties she experienced after the hijacking made it necessary for her to leave the profession. (Pflug, T-1-80.)

226. Pflug says she never returned to school because she no longer had "that kind of high level of thinking" necessary for a doctorate. (Pflug, T-1-80.)

227. Pflug's injuries, her long recovery process, the experience of being a hijacking victim, and her overall emotional state changed her significantly, and the pressure caused severe difficulties in her marriage to Scott Pflug, which ended in divorce three years after the hijacking. (Pflug, T-3-81; Pflug, T-1-83-86.)

228. Pflug's permanent physical and mental injuries stemming from the EgyptAir hijacking include memory loss, vision problems, learning disabilities, epileptic seizures, post-traumatic stress disorder, and clinical depression. (Pflug, T-1-73, 96; Spector, T-3-98.)

229. The emotional scarring that Pflug suffered during the hijacking and after has been severe and permanent; she struggles on a daily basis with exhaustion and frustration with her diminished abilities. (Pflug, T-1-102-103; Pflug, T-1-91).

230. As a direct result of Pflug's injuries, she has been under continuous doctors' care starting from the time of her initial treatment at St. Luke's Hospital in Malta immediately after her rescue. (Pflug, T-1-79.)

231. The Court heard testimony from Pflug herself, and also from: Jackie Pflug's father, Eugene J. Nink; Pflug's husband at the time of the EgyptAir hijacking, Scott Pflug; her siblings Mary E. Nink O'Donnell and Gloria Jo Nink; and her current husband James A. Olsen, who also testified about their minor son, Tanner Olsen. (Jackie Pflug, T-1-16; Eugene Nink, T-4-46; Scott Pflug, T-3-48; O'Donnell, T-4-54; Gloria Nink, T-4-71; James Olsen, T-4-36.)

232. Pflug's family was close as she was growing up in Texas, and were "really involved" with each other's lives. (Nink, T-4-50; Nink, T-4-75.)

233. The Nink family would take summer vacations together, visit relatives and would frequently engage in other family activities. (O'Donnell, T-4-58.)

234. Pflug's parents were very supportive of their daughter, and were involved in coordinating activities for her when she was a child. (Nink, T-4-76.)

235. Pflug's family remained a close-knit unit throughout the time period when Pflug left home. (O'Donnell, T-4-58.)

236. When Jackie Pflug decided to go abroad to teach, the family was excited for, her but was also "heartbroken" because of the distance that would separate them. (O'Donnell, T-4-60, 64.)

237. Despite the distance, Pflug and her siblings and parents stayed in touch though letters and telephone conversations. (O'Donnell, T-4-61, 64.)

238. When they married, Jackie and Scott Pflug wanted to continue to live overseas, travel, and "do the job [they] love[d]" together. (Pflug, T-3-81.)

239. They did not want to be separated, so they sought schools where each of them could get positions, eventually finding jobs at the Cairo American College. (Pflug, T-3-53-55.)

240. Testimony described Pflug, prior to the EgyptAir hijacking, as "adventurous," and as someone who enjoyed traveling and seeing the world. (Nink, T-4-51.)

241. Pflug was also described as being "very active," "outgoing," "cheerful," and "happy." (O'Donnell, T-4-60; Nink, T-4-78.)

242. Following the hijacking and shooting, Pflug's family did not know for approximately six to eight hours whether she was dead or alive. (O'Donnell, T-4-65.)

243. Pflug's mother cried after hearing news that her daughter was on the hijacked airliner. (Nink, T-4-80.)

244. Pflug's oldest sister, Gloria, testified that she felt "devastated" knowing both that Pflug

was on the hijacked EgyptAir airliner, and that she had to relay the tragic news to her mother. (Nink, T-4-80.)

245. Pflug's parents and siblings were extremely upset after learning that Pflug had been shot in the head during the EgyptAir hijacking. (O'Donnell, T-4-69.)

246. Scott Pflug, her husband at the time, felt "blown away" and "devastated" when he heard that his wife that had been shot, and he did not believe she was still alive. (Pflug, T-3-61-62.)

247. After four days in the hospital in Malta, and another three or four days at a military hospital in Germany, Pflug and her husband returned to the United States. (Pflug, T-3-65, 69-71.)

248. Scott Pflug cared for his wife full-time from the time of their return to the United States until their divorce three years later. (Pflug, T-3-79-80.)

249. Eugene Nink testified that, after seeing Pflug following the hijacking with her substantial injuries, she was "different," and this caused him to worry. (Nink, T-4-53.)

250. Rylma Nink was also "extremely worried" about her daughter. (O'Donnell, T-4-68.)

251. Pflug's sister, Mary Nink O'Donnell, described Pflug following the hijacking and injuries as "[not] being the Jackie we all knew." (O'Donnell, T-4-69.)

252. Pflug's siblings were distraught by the fact that, as a result of her injuries sustained during the EgyptAir hijacking, she had lost so much of what she had worked so hard to achieve. (O'Donnell, T-4-69.)

253. Pflug's siblings continue to worry about her to this day. (O'Donnell, T-4-70.)

254. Pflug's mother and father were also very worried for her, and knew that their daughter's life had been changed forever. (Nink, T-4-86-87.)

255. Scott Pflug testified that after the EgyptAir hijacking, Pflug was not the same person he married, and they no longer had the same way of looking at things. (Pflug, T-3-81-82.)

256. James "Jim" Olsen, Pflug's current husband, testified that the EgyptAir hijacking "affects [them] daily," and he must watch over her to "pick up" the tasks that she cannot do on her own. (Olsen, T-4-42.)

257. There is a time of the day that Olsen describes as "the overload part of the day," when Pflug "becomes irritable, impatient, [and] has a tendency to cry because she can't go on anymore during the day," which saddens Olsen. (Olsen, T-4-43.)

258. Olsen worries about leaving the home for long periods of time, because he is worried that "Jackie might not be able to handle what goes on around the house" and keeping up with their son. (Olsen, T-4-43.)

259. Tanner, Pflug's only son, is deeply affected by the stories of his mother's horrific ordeal and sometimes says "that he's very afraid that someone is going to get him like someone got [his] mom." (Olsen, T-4-43).

## V. CONCLUSIONS OF LAW

In 2008, the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008) (hereinafter "2008 NDAA") revised the FSIA framework under which state-sponsored terrorism cases may be brought by substituting 28 U.S.C § 1605A in place of 28 U.S.C. § 1605(a)(7). Perhaps most important, it furnished a cause of action against state sponsors of terrorism, while the earlier law, § 1605(a)(7), could only be used as a "pass-through" for plaintiffs seeking to bring suit in federal court against foreign sovereigns for terrorism-related claims; the claims themselves had to be based in state law. Murphy v. Islamic Republic of Iran, No. 06-CV-596, 2010 U.S. Dist. LEXIS 101250, at *3 (D.D.C. Sept. 14, 2010).

### A. Retroactive Application of 28 U.S.C. § 1605A under Section 1083(c) of the 2008 NDAA

One of the reasons why the creation of a federal cause of action was so important was the frequent disparities between state laws. Plaintiffs who were victims of the same terrorist attack could be subject to different levels of recovery, or even no recovery at all, based entirely on their state of domicile at the time of the incident. See In re: Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 46-47 (D.D.C. 2009). Thus, in an effort to rectify the potential for further uneven treatment, the 2008 NDAA also provided for the retroactive application of the § 1605A cause of action for certain pending cases. Under § 1083(c)(2), captioned "Prior Actions," cases

26

that were brought under § 1605(a)(7) that were before the courts at the time of the enactment of the 2008 NDAA could, on plaintiffs' motion, be given effect "as if the action had originally been filed" under § 1605A. 2008 NDAA § 1083(c)(2).  Under § 1083(c)(3), captioned "Related Actions," if an action arising out of an incident had been timely commenced under § 1605(a)(7), any other action arising out of the same incident could be brought under § 1605A. 2008 NDAA § 1083(c)(3).

Parties seeking to take advantage of the new federal cause of action and punitive damages allowance under the 2008 NDAA found themselves somewhat confused by the new statute; filing deadlines were missed by those who thought retroactivity was automatic, whereas others seemed unclear as to whether they should file under § 1083(c)(2) or (3), and thus filed under both.  See Terrorism Litig. at 66-67.  The latter approach is what Chief Judge Lamberth, in his omnibus In re: Islamic Republic of Iran Terrorism Litig. opinion, referred to as the "belt and suspenders" approach. Id.

The original complaint filed in Baker on March 25, 2003 asserted the subject matter jurisdiction for the case under 28 U.S.C. § 1605(a)(7). Baker, Complaint [#1] at ¶¶ 2-5.  In 2008, the Court granted plaintiffs' motion to amend the complaint filed in Baker, restating subject matter jurisdiction for the case under 28 U.S.C. § 1605A. Baker, Order of Feb. 29, 2008, Docket No. 65; Second Amended Complaint [#66] at ¶¶ 1-5.  The original complaint in the Pflug case, filed on March 24, 2008, asserted subject matter jurisdiction under 28 U.S.C. § 1605A. Pflug, No. 08-CV-505, Complaint [#1] at ¶¶ 1-5.  The Pflug complaint does not contain any plaintiffs or claims other than those pled in the Baker original or amended complaints.

Thus, these cases have taken the "belt and suspenders" approach.  As it is clear that

plaintiffs are able to receive retroactive treatment for <u>Baker</u>, the earlier action, as much as for

<u>Pflug</u>, it would be a waste of judicial resources to proceed with both cases.  Therefore, the <u>Pflug</u>

case shall be dismissed.  <u>See</u> <u>Terrorism Litig.</u> at 97-98.

**B.**     **Service of Process and State Law Claims**

Service under the FSIA is governed by 28 U.S.C. § 1608.  Subsection (a) governs service

upon a foreign state or political subdivision of a foreign state, while subsection (b) provides for

service upon an agency or instrumentality of a foreign state.  In determining whether a foreign

entity is to be treated as the state itself or as an agency or instrumentality, courts employ the

"core functions" test as it was set out in <u>Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228 (D.C.

Cir. 2003). <u>Id.</u> at 234.  The approach is categorical: if the core functions of the entity are

governmental, it is considered to be the foreign state itself. <u>Id.</u>  If its core functions are

commercial, then it is an agency or instrumentality of the foreign state. <u>Id.</u>

In this case, service upon each of the Syrian defendants in <u>Baker</u> was perfected under 28

U.S.C. § 1608(a)(3) through delivery of the required documents (accompanied by Arabic

translations) to the Head of the Ministry of Foreign Affairs via international courier service.

Certificate, <u>Baker v. Great Socialist People's Libyan Arab Jamahiriya</u>, No. 03-CV-749 (D.D.C.

Sept. 5, 2003), Docket No. 9.[7]  Obviously, § 1608(a) was the applicable provision, as the Syrian

---

[7] When Judge Kessler ordered that the <u>Baker</u> complaint could be amended to include plaintiffs' §
1605A claims, she also ordered that no separate service was necessary, as no new claims were
asserted. <u>Order</u>, Baker, No. 03-CV-749 (D.D.C. Feb. 29, 2009), Docket No. 65.  <u>See</u> Fed. R.
Civ. P. 5(a)(2); <u>see also</u> <u>Terrorism Litig.</u> at 106-07 ("Thus, by its plain terms, § 1083 indicates
that no further action under Rule 5 or otherwise should be required of plaintiffs before their
case may move forward under § 1605.  More fundamentally, however, as emphasized above,
this Court does not find that a change in the rule of decision applicable to personal injury or
wrongful death claims under the FSIA terrorism exception results in new claims of relief for
purposes of the pleading requirements in these cases.").

Arab Republic is a foreign state. Each of the other remaining defendants, however, is also treated as the foreign state under the law.

Applying the Roeder core functions test, the Syrian Air Force Intelligence agency, Idarat al-Mukhabarat al-Jawiyya, is characterized as the foreign state itself, because its core functions are governmental, not commercial. See Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 64 (D.D.C. 2008) ("Gates I") (citing Roeder, 333 F.3d at 234). Syria's Director of Military Intelligence, General Muhammad al-Khuli, is characterized as the foreign state itself because "an officer of an entity that is considered the foreign state itself under the core-functions test should also be treated as the state itself for purposes of service of process under § 1608." Nikbin v. Islamic Republic of Iran, 471 F. Supp. 2d 53, 65-66 (D.D.C. 2007). The complaint asserts that al-Khuli "performed acts within the scope of his office, which caused the terrorist acts described below." Second Amended Complaint at ¶ 36. An official-capacity claim against a government official is a claim against the government itself. Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1034 (D.C. Cir. 2004). Because each defendant is treated as the state itself under the core functions test, and service was never made on al-Khuli in his individual capacity, Syria is the only defendant against whom damages can be sought. See Gates I, 580 F. Supp. 2d at 64.

Finally, FSIA plaintiffs may not bring state law causes of action against a foreign state that has engaged in state-sponsored terrorism under 28 U.S.C. § 1605A. Beer v. Islamic Republic of Iran, No. 08-CV-1807, 2010 U.S. Dist. LEXIS 129953, at *28 (D.D.C. Dec. 9, 2010); Gates I, 580 F. Supp. 2d at 66. Therefore, plaintiffs' claims based on state law will be dismissed.

**C.** **Standing**

In order to have standing in an action under 28 U.S.C. § 1605A, either the claimant or the

victim of the terrorist attack must have been a United States citizen at the time of the attack. Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15, 26 (D.D.C. 2008). Each of the victims was a United States citizen at the time of the attack, so both they and their immediate families (at the time of the attack) have standing. Unfortunately, two plaintiffs do not have the necessary standing for a claim under the federal cause of action.

As will be discussed below, a claim for solatium is nearly identical to a claim of intentional infliction of emotional distress. Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) (citing Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009)). The Court takes guidance from the Restatement (Second) of Torts when examining individual torts under the federal cause of action. Terrorism Litig. at 60. The section of the Restatement relevant to claims of solatium is section 46, "Outrageous Conduct Causing Severe Emotional Distress." Restatement (Second) of Torts § 46 (1965). As has been noted in this Circuit, Section 46 of the Restatement (Second) of Torts does not extend causes of action beyond members of the victim's "immediate family." Bettis v. Islamic Republic of Iran, 315 F.3d 325, 334-35 (D.C. Cir. 2003). Solatium awards have been explicitly confined to "immediate family" members, including spouses, children, parents, and siblings. Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 196 (D.D.C. 2003). On the other hand, the presence requirement that is often required by this cause of action is obviated, because "[a]ll acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." Anderson v. Islamic Republic of Iran, ___ F. Supp. 2d __, No. 08-CV-535, 2010 WL 4871189, at *14 (D.D.C. Dec. 1, 2010) (citing Heiser, 659 F. Supp. 2d at 27).

Jackie Pflug married James Olsen in 1996, and had her son, Tanner Olsen, in 1997. Each of these plaintiffs makes a claim for solatium stemming from Pflug's injuries sustained during the attack and the resultant ongoing health problems. However, while they are a part of Pflug's immediate family now, they were not at the time of the attack. In Peterson, the court held that "those members of the families of the servicemen who are not within the immediate family of the serviceman *at the time of the attack* may not recover." Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 45 (D.D.C. 2007) ("Peterson II") (emphasis in original); see also id. at 46 n.21 ("Current spouses who were not yet married to an injured serviceman at the time of the attack are not considered 'immediate family' for the purposes of recovery").

While the Peterson opinion is not controlling, it is very compelling. Its guidelines are cited frequently in cases filed under 28 U.S.C. § 1605A. See *infra* at V.G.2. While the federal cause of action has been interpreted to obviate the presence requirement, I see no indication that it has also been extended to persons who were not immediate family members at the time of the attack, particularly considering that the restriction to immediate family members has remained firmly in place. See Valore, 700 F. Supp. 2d at 79 (noting that nieces, nephews, aunts, uncles, non-adoptive stepparents, and non-adoptive stepchildren are not "immediate family"). While there has been a case where an unborn child was deemed to be eligible for solatium damages, it was based on the idea that the unborn child was at least a viable fetus at the time of the harmful act. See Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 108-11 (D.D.C. 2000) (daughter of former hostage received compensatory damages when her mother was seven months pregnant at the time of the kidnapping) (citing Bonbrest v. Kotz, 65 F. Supp. 138,140 (D.D.C. 1946) (child had standing to sue a doctor when that child was a viable fetus injured directly by

the actions of that doctor)).

The very nature of a claim for solatium or intentional infliction of emotional distress necessitates a relationship between the victim and the claimant at the time of the attack. Intentional infliction of emotional distress requires an element of shock. If the definition of emotional distress were expanded to include claimants who were not immediate family members at the time of the attack, the potential number of claimants would be unidentifiable, changing with every new marriage or new child.

In no way would I wish to say that James Olsen does not suffer from the ramifications of the attack on his wife—he has been by her side to support her through her continuing struggle, which involves monitoring her for seizures and helping her when she becomes over-exhausted on a daily basis. Be that as it may, I cannot find, in light of the definitions of "immediate family" in earlier cases, that a man whom Pflug had not even met at the time of the attack can have standing as a victim. Therefore, James Olsen will be dismissed as a plaintiff in this action.

As for Pflug's son, Tanner, I cannot reason that the expansion made in <u>Anderson</u> lends itself to finding that a child born nearly twelve years after his mother was attacked has standing to recover damages resulting from the attack. Tanner Olsen will also be dismissed as a plaintiff in this action.

### D. Jurisdiction

#### 1. *Subject Matter Jurisdiction*

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state" in United States courts. <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 488 U.S. 428, 434 (1989). One of the enumerated exceptions to the FSIA is 28 U.S.C. § 1605A, the state-

sponsored terrorism exception to sovereign immunity. Under § 1605A, a foreign state that is or

was a state sponsor of terrorism shall be liable to a United States citizen for personal injury or

death. 28 U.S.C. § 1605A(c). Damages under this private right of action may include economic

damages, solatium, pain and suffering, and punitive damages. Id. In such an action, a foreign

state is vicariously liable for the acts of its officials. Id.

Under § 1605A, "[a] foreign state shall not be immune from the jurisdiction" of the

United States courts in a case where "money damages are sought against a foreign state for

personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft

sabotage, hostage taking, or provision of material support or resources for such an act" if an

"official, employee, or agent of [the] foreign state" engages in such provision of material support

"while acting within the scope of his or her office."[8] 28 U.S.C. § 1605A(a)(1). In addition to the

requirements for the sovereign immunity exception, a court shall hear a claim under § 1605A if

(1) the foreign state was designated as a "state sponsor of terrorism"[9] by the State Department at

---

[8] 28 U.S.C. § 1605A(h)(3) defines "material support or resources" as "the meaning given that term in section 2339A of title 18." 18 U.S.C. § 2339A(b) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel."

[9] The term "state sponsor of terrorism" is defined at 28 U.S.C. § 1605A(h)(6):

> [T]he term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

the time the act took place and (2) the victim or plaintiff was a national of the United States at the time the act took place. 28 U.S.C. § 1605A(a)(2); see also Acosta, 574 F. Supp. 2d at 25.

As to sovereign immunity, testimony both from expert witnesses and Abu Nidal terrorists themselves makes clear the fact that Syria knowingly provided material support to the ANO for its training operations, and participated in the logistical planning and operations concerning the EgyptAir hijacking, as well as the Rome and Vienna Airport Attacks. Syria provided safe haven for the ANO at least as early as 1983.[10] Syria was designated by the State Department as a state sponsor of terrorism in December 1979, and has retained that designation to this day.[11]

As discussed in section C, *supra*, each of the three victims in this case were United States citizens at the time of the hijacking. Therefore, the remaining plaintiffs each maintain a valid cause of action under § 1605A, and this Court may properly exercise jurisdiction.

2. *Personal Jurisdiction*

As noted above, the FSIA establishes requirements for proper service upon a foreign state in 28 U.S.C. § 1608; plaintiffs properly served Syria under § 1608(a)(3). *Supra* at V.B.

---

[10] When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of "safehouse" under 18 U.S.C. § 2339A(b):

> Insofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al Qaeda and Hezbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks—as the complaint unambiguously alleges—Sudan provided a "safehouse" within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7).

Owens v. Republic of Sudan, 412 F. Supp. 2d 99, 108 (D.D.C. 2006).

[11] State Sponsors of Terrorism, http://www.state.gov/s/ct/c14151.htm (last visited Feb. 21, 2011).

Furthermore, having determined that Syria as a foreign state is the only defendant against whom an action may properly be maintained (id.), there is no issue of due process under the Fifth Amendment, as "foreign states are not 'persons' protected by the Fifth Amendment." <u>Valore</u>, 700 F. Supp. 2d at 70 (quoting <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82, 96 (D.C. Cir. 2002)).  Finally, "customary international law," which may call for a "minimum-contacts-like test" is inapplicable in these circumstances. <u>Valore</u>, 700 F. Supp. 2d at 72.  The Court has personal jurisdiction over Syria in this case.

### E. Legal Standard for FSIA Default Judgment

Under the FSIA, a default judgment may only be entered if "the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  All uncontroverted evidence is accepted as true. <u>Id.</u>  See also <u>Campuzano v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (the "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)).

In evaluating plaintiffs' proofs, a court may "accept as true plaintiffs' uncontroverted evidence, which may take the form of sworn affidavits or prior transcripts." <u>Estate of Botvin v. Republic of Iran</u>, 510 F. Supp. 2d 101, 103 (D.D.C. 2007).  Such evidence may also include judicial notice of findings and conclusions of related proceedings. <u>Id.</u>; <u>see also</u> <u>Peterson v. Islamic Republic of Iran</u>, 264 F. Supp. 2d 46, 49 n.2 (D.D.C. 2003) ("<u>Peterson I</u>").

In light of defendants' failure to object or enter an appearance to contest the matters in this case, the Court accepts the uncontested evidence and sworn testimony submitted by plaintiffs as true.

### F.    Liability

The federal right of action in the FSIA provides, among other things, that a foreign state that is or was a state sponsor of terrorism shall be liable to a United States citizen for personal injury or death caused by provision of material support or resources for an act of torture, extrajudicial killing, aircraft sabotage, or hostage-taking if an official of the foreign state engages in such provision of material support while acting within the scope of his office. 28 U.S.C. § 1605A(a-c).

The basis of Syria's liability is its provision of material support and resources to the ANO.  The FSIA explicitly provides that "a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." 28 U.S.C. § 1605A(c).  Vicarious liability is a common law concept, wherein "[o]ne may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement." Acosta, 574 F. Supp. 2d at 26.  As noted above, the Court looks to common law as illustrated by the Restatement (Second) Torts when seeking to define a federal cause of action under 28 U.S.C. § 1605A(c).  See Terrorism Litig., 659 F. Supp. 2d at 60; see also Bettis, 315 F.3d at 333.

The theory of civil conspiracy provides a basis of liability in this case; the Court declines to reach the issue of whether they might also be liable under other theories of vicarious liability. Acosta, 574 F. Supp. 2d at 26.  The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; and (4) which overt act was done pursuant to and in furtherance of the common scheme. Id. at 27 (citing Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983)).

An agreement may be inferred from conduct. <u>Bodoff v. Islamic Republic of Iran</u>, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (citations omitted).  As this Court has noted on a number of occasions, "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." <u>Id.</u> (quoting <u>Flatow v. Islamic Republic of Iran</u>, 999 F. Supp. 1, 27 (D.D.C. 1998)).  It has been established, with evidence satisfactory to the Court, that Syria, through its officials acting in their official capacity, provided funding, training, safe havens, access, and a variety of other supports to the ANO.  Former State Department officials and expert witnesses testified that the ANO would have been unable to accomplish the EgyptAir hijacking and the Rome and Vienna Airport attacks without Syrian aid.[12]  The elements of a civil conspiracy between Syria and the ANO are therefore satisfied.

G.     **Damages**

Plaintiffs have proven defendants' liability under 28 U.S.C. § 1605A(c) to the satisfaction of this Court, entitling them to damages including economic damages, solatium, pain and suffering, and punitive damages. 28 U.S.C. § 1605A(c).

1.     *Economic Damages*

Evidence of the lost earning capacity for Rogenkamp, Baker, and Pflug was presented by Dr. Markham, an economist accepted by the Court as an expert in the field of forensic economics.

The testimony and expert reports of Dr. Markham reviewed the methodology of calculation of economic loss, and calculated lost earnings and pension for each of the hijacking

---

[12] In cases involving the state sponsor of terrorism exception to the FSIA, courts rely extensively on expert testimony. <u>Gates I</u>, 580 F. Supp. 2d at 68 n.13.

victims. Having reviewed the evidence and testimony of the plaintiffs, Baker, Pflug, and Patricia

Henry, as administrator of the estate of Rogenkamp, and having considered the testimony of Dr.

Markham, the Court finds as follows:

a. Scarlett Rogenkamp

Dr. Markham calculated that, were it not for the hijacking, Rogenkamp would have had a

life expectancy of 82.67 years of age. Pltf's Exh. 91 at 2. Rogenkamp was a civilian civil service

employee for the United States Air Force at the time of her death; based on her salary in 1985,

Dr. Markham determined that she was a GS-12 in the General Schedule for federal service

employees. Id. Based on the pension available to federal civil service employees, Dr. Markham

estimated that Rogenkamp would have retired at age 60. Id. He calculated her lost earnings and

pension based on two alternate hypotheses: that she would remain a GS-12, Step 5 employee for

the rest of her career, or that she would remain a GS-12, but rise as quickly as possible to a GS-

12, Step 10 status.[13] Id. First, Dr. Markham concluded that Rogenkamp was hired early enough

to qualify for the Civil Service Retirement System (CSRS), and thus would have first been

eligible for full retirement at age 60, in 2007. Id. Next, Dr. Markham determined that, based on

29 years' worth of service, her annual pension would have been 54.25% of the average of her

highest three years' salary. Id. at 3. Dr. Markham also included the appropriate cost of living

adjustments and General Schedule changes in determining lost earnings and pension annuities.

Id. at 2-3. He discounted the future pension benefits to their present value, based on the average

returns available on high-grade municipal bonds. Id. at 3. Finally, Dr. Markham deducted what

---

[13] Civil service rules direct how quickly an employee can progress through steps. See Office of
Personnel Management (OPM) General Schedule Within-Grade Increases,
http://www.opm.gov/oca/pay/HTML/wgifact.asp (last visited Mar. 22, 2011).

she would have spent for direct personal consumption ("maintenance"), as that would not have been available to her estate. Id.

Alternatively, plaintiffs' counsel proposed that, since retirement from civil service when one is eligible for the pension under the CSRS was not mandatory, Rogenkamp may not have retired until age 70. Pltf's Counsel, T-4-121. Although people may work longer these days than they once did, I am not convinced that would have been Rogenkamp's career path. (Pltf's Counsel, T-4-111) Given the fact that Rogenkamp's family testified to her outgoing nature and zest for life, I find it more likely that she might have chosen to enjoy her retirement rather than remain in a civil service position. Thus, I will accept Dr. Markham's calculations based on a retirement at age 60.

As for Rogenkamp's pay grade, based on the letter from her supervisor (Pltf's Exh. 15), I find it likely that she would have attained the level of GS-12, Step 10 at the fastest rate possible.

The estate of Scarlett Rogenkamp is therefore entitled to receive compensatory damages for the total amount of economic loss damages sustained as a result of her murder. Based on Dr. Markham's calculations, assuming retirement at age 60 at a GS-12, Step 10 pay grade, the Court does hereby award economic damages to Rogenkamp's estate against the Syrian defendants in the amount of $408,377 in lost earnings and $378,231 in lost pension, for a total of $786,608.

b.     Patrick Baker

Dr. Markham calculated that, based on Baker's age at the time of the hijacking (28.4 years), his life expectancy prior to the hijacking was 77.2 years of age. Pltf's Exh. 92 at 2. Dr. Markham calculated that Baker's statistically expected worklife, based on his age and education, is to the age of 61.7, while his age of retirement for Social Security purposes is 66.5. Id. Dr.

Markham also produced tables showing the average earnings for people with bachelor's and master's degrees, from the 10th to the 75th percentiles of earning capacity, in the year 2008. Id. at Tables 1-2. He compared Baker's earnings as a commercial fisherman and, more recently, with Anvil Corporation, to what he might have made based on the averages in those tables. Id. at Tables 3-6. In addition, Dr. Markham calculated a post-retirement pension based on a contribution from employers at 4.8% of wages and salaries. Id. at 3.

Baker testified that he had intended to work for a period after earning his bachelor's degree to pay off his college debt, and then to work in a laboratory and earn a master's degree. Baker's mother holds a master's degree in medical technology, and worked in laboratories herself, so it seems likely that Baker would have followed in her footsteps. It is entirely understandable that Baker's experience on EgyptAir Flight 648 would cause him to withdraw, and to abandon lifetime goals he might otherwise have fulfilled. I will therefore accept Dr. Markham's calculations based on the presumption that Baker would earn a Master's degree.

As with Rogenkamp, plaintiffs' counsel suggested that Baker might work to the age of 70. Pltf's Counsel, T-4-133. I see no reason to think that Baker would have worked that long, particularly if his calculated life expectancy was 77.2 years old. On the other hand, I see no reason to believe that he would have retired as early as 61.7 years of age. I will therefore accept Dr. Markham's calculations based on the age of retirement for Social Security purposes, 66.5 years of age.

Patrick Baker is therefore entitled to an award of compensatory damages for the total amount of economic loss damages he sustained. Dr. Markham calculated that Baker's total lost earnings and pension, based on the difference between his actual earnings and his potential

earnings had Baker earned a master's degree as he intended. Pltf's Exh. 92 at 3. Based on Dr. Markham's calculations, the Court does hereby award economic damages to Baker against the Syrian defendants in the total amount of $1,660,082.

        c.      <u>Jackie Pflug</u>

Dr. Markham calculated that, based on Pflug's age at the time of the attack (30.8 years old), her life expectancy prior to the hijacking was 81.8 years of age. Pltf's Exh. 90 at 2-3. Dr. Markham calculated that Pflug's statistically expected worklife, based on the age at which a member of the Minnesota Teachers Retirement Association (of which Pflug would have been a member, had she taught in Minnesota) may retire with unreduced pension benefits, would have been 60.8 years old. <u>Id.</u> at 3. Dr. Markham further calculated Pflug's earning capacity absent the attack, and determined that Pflug's earnings would have increased from the $30,000 she earned as a special education teacher in Minnesota in 1988 at a rate of 2% per year, the rate of annual salary increase used by the Teachers Retirement Association to project future pension estimates for members. <u>Id.</u> He ultimately projected that her salary would increase linearly to the salary at the 75th percentile for special education teachers in 2008, $65,570. <u>Id.</u> He also discounted future earnings to present value with the average yield on high-grade municipal bonds. <u>Id.</u> Finally, Dr. Markham calculated Pflug's pension benefits based on the Minnesota Teachers Retirement Association plan.

Plaintiffs' counsel asked that Dr. Markham also calculate Pflug's earnings had she retired either when she was eligible for Social Security, 66.17 years of age, or at age 70. Pltf's Counsel, T-4-163. Plaintiffs' counsel also asked Dr. Markham to calculate Pflug's salary had she been in the 90th percentile for special education teachers, which may be affected by the highest

academic degree a teacher has attained. Id. at T-4-167-68.

While I am not convinced that Pflug would have retired at the age of 70, I do believe her age of retirement for Social Security purposes, 66.17 years old, seems reasonable. Pltf's Exh. 90(c). I also believe that Pflug may have reached the 90th percentile salary level for special education teachers. Pflug was very determined to pursue her doctorate, and planned to begin in the summer of 1986. As a special education teacher with a diverse teaching background and such an advanced degree, I agree that she would have reached the upper echelons of potential salary levels. I will therefore accept Dr. Markham's calculations for Pflug based on her retiring at 66.17 years of age, while earning within the 90th percentile for special education teachers. Id.

When calculating Pflug's earning capacity, Dr. Markham also considered her past, present, and future income as a motivational speaker. Pltf's Exh. 90 at 3. Pflug's public speaking came about as a result of her sharing her survival story; thus, it would not have happened but for the attack. Pflug, T-1-95-97. Therefore, Dr. Markham subtracted Pflug's past and future earnings as a motivational speaker. Pltf's Exh. 90 at 4. He estimated her future income from motivational speaking at half the rate of her past income, as she has recently had to cut her motivational speaking in half. Id.

Pflug is therefore entitled to an award of compensatory damages for the total amount of economic loss damages she sustained, minus her earnings as a motivational speaker (which she would not have earned but for the hijacking). Based on Dr. Markham's calculations using the above variables (as set forth at Pltf's Exh. 90(c) at 4), this Court accordingly does hereby award damages to Pflug against the Syrian defendants, in the amount of $679,844.

2.      *Pain and Suffering*

a.      Scarlett Rogenkamp

The estate of Rogenkamp, through her sister Patricia Henry, seeks damages for pain and suffering incurred between the time Rogenkamp was shot and the time she died, in addition to the damages for lost earnings and pension. Several cases have awarded damages for this type of pain and suffering. Peterson, 515 F. Supp. 2d at 53. When the victim endured extreme pain and suffering for a period of several hours or less, courts have "rather uniformly" awarded the estate $1 million. Id. (citing Haim v. Islamic Republic of Iran, 425 F. Supp. 2d 56, 71-72 (D.D.C. 2006)). See also Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (awarding $1 million for pain and suffering endured in the several minutes between the suicide bombing of a passenger bus and the victim's death); Flatow, 999 F. Supp. at 28 (awarding $1 million for pain and suffering endured for three to five hours between the suicide bombing of a bus and the victim's death). When the period of the victim's pain was longer than a few hours, the awards have increased. Haim, 425 F. Supp. 2d at 72 (citing Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 91 (D.D.C. 2002) (awarding $1.5 million for pain and suffering endured over a 15-hour period in which the victim was repeatedly beaten before being shot)). Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent.

The initial hijacking took place approximately eight hours before Rogenkamp was brought to the front of the plane and fatally shot. While she was not beaten during that time, she no doubt suffered the mental anguish of fearing for her life, and of watching three of her fellow

passengers shot before her. I therefore find that an award of $1 million for the pain and suffering endured by Rogenkamp before her death is appropriate.

b.     <u>Patrick Baker</u>

Damages for pain and suffering for surviving victims are based on an assessment of factors such as the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life. <u>Valore</u>, 700 F. Supp. 2d at 83-84 (citing <u>Peterson</u>, 515 F. Supp. 2d at 52 n.26). In <u>Peterson</u>, the Court granted a baseline award of $5 million to individuals suffering injuries such as compound fractures, broken jaws, severe flesh wounds, continuing back and shoulder injuries, and continuing psychological and substance abuse problems stemming from the attack. <u>Peterson</u>, 515 F. Supp. 2d at 54-56. The court departed upward from the baseline in several cases, including to $7.5 million for an individual who lost sight in one eye and ruptured an eardrum, in addition to experiencing lasting psychological problems; to $8 million for an individual who was mistaken for dead, placed in a body bag, and left in a morgue for four days; and as high as $12 million for an individual who suffered a broken neck, resulting in permanent quadriplegia. <u>Id.</u> The court departed downward from the baseline in cases where injuries were minor, including injuries from being hit by shrapnel from the explosion. <u>Id.</u>

Patrick Baker suffered from a severe laceration to the head as a result of being shot at close range, along with contusions and abrasions resulting from his being thrown onto the tarmac twice. He also suffered from the knowledge that he might be killed at any moment, even observing to another passenger that he knew he would be the next to be shot. He has continued to suffer from the psychological ramifications of the attack to this day. Therefore, I find that the

baseline award granted for pain and suffering in <u>Peterson</u> is appropriate, and will award Baker $5 million in damages.

       c.     <u>Jackie Pflug</u>

Jackie Pflug suffered from extensive and lasting physical injuries as a result of the attack. The shooting caused damage to her skull and brain, and she required surgery to remove both the bullet and the fragments of skull that were pushed into her brain. The surgery left her with a partially caved-in head, which later required further surgery to insert a metal plate into her skull. She also suffers from diminished peripheral vision and significant visual perception problems. Her cognitive abilities were impaired, and she was unable to count money or tell time after she was shot. She has also suffered from *grand mal* epileptic seizures since she was shot. Finally, she has suffered from post-traumatic stress disorder and severe depression as a result of the attack.

The severe extent of Pflug's injuries warrants an upward departure from the <u>Peterson II</u> baseline. Using the awards given in that case as a guideline, I will award Pflug $8 million in damages for her pain and suffering resulting from the attack.

       *3.*    *Solatium*

A claim of solatium seeks compensation for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." <u>Belkin v. Islamic Republic of Iran</u>, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) (citing <u>Dammarell</u>, 281 F. Supp. 2d at 196-97). As discussed in section C, *supra*, a solatium claim under the FSIA is nearly indistinguishable from a claim for intentional infliction of emotional distress. <u>Valore</u>, 700 F.

Supp. 2d at 85 (citing Heiser, 659 F. Supp. 2d at 27 n.4). "In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium." Acosta, 574 F. Supp. 2d at 29.

In recent cases, the framework used in Peterson II, 515 F. Supp. at 52, has been applied in several cases to calculate solatium damages. See Valore, 700 F. Supp. 2d at 85; Belkin, 667 F. Supp. 2d at 23. In Valore, the appropriate amount of solatium damages for the families of deceased victims was calculated as follows: $8 million to spouses of deceased victims, $5 million to parents of deceased victims, and $2.5 million to siblings of deceased victims.[14] Valore, 700 F. Supp. 2d 85. The appropriate amount of damages for family members of injured victims was calculated as follows: $4 million to spouses of injured victims, $2.5 million to parents of injured victims, and $1.25 million to siblings of injured victims. Id. The court in Valore also noted, however, that the amounts are a guide, and not set in stone. Id. at 86. There may be upward departures where there are "aggravating circumstances," as may be indicated by testimony that "describes a general feeling of permanent loss or change caused by decedent's absence" or "medical treatment for depression and related affective disorders." Id. (citations omitted). Self-destructive behavior or a need for psychiatric treatment starting after the incident may also indicate a particularly powerful feeling of loss. Id. On the other hand, there may be circumstances where a downward departure is appropriate, as when the relationship between the decedent and claimant is more attenuated. Id.

The Court adopts these amounts as guidelines for making its determinations with regards

---

[14] While it did not come up in Valore, the court in Peterson determined that parents and children of victims were entitled to the same award. Peterson, 515 F. Supp. 2d at 52.

to solatium damages.

a.    The Family of Scarlett Rogenkamp

The Court finds that the guideline amounts used in Valore are appropriate for members of Rogenkamp's family, with two exceptions.  As evidenced in the findings of fact section, *supra*, Rogenkamp's brother, Paul Peterson, and her sister, Katherine Doris, have been hit particularly hard by their sister's death.  Peterson was so traumatized by his sister's funeral that he was later unable even to attend his parents' funerals, and has turned to self-destructive behavior to cope with his pain over his sister's death.  Doris had to be hospitalized for asthma and shock shortly after Rogenkamp's death, and has battled depression ever since.  In light of their particular difficulties, the Court will depart upward by 25% from the standard award for each of them, from $2.5 million to $3.125 million.

Based upon all of the testimony and evidence, the Court finds that awards in the following amounts are appropriate in compensation, as solatium, for the loss suffered by each individual family member of Scarlett Rogenkamp:

| | |
|---|---|
| Estate of Hetty Peterson (mother) | $5,000,000 |
| Estate of Vernon Peterson (father) | $5,000,000 |
| Patricia Henry (sister) | $2,500,000 |
| Michelle Holbrook (sister) | $2,500,000 |
| Paul Peterson (brother) | $3,125,000 |
| Katherine Doris (sister) | $3,125,000 |

b.    The Family of Patrick Baker

The Court also finds that the guideline amounts used in Valore are appropriate for members of Baker's family, without any departures.  Based upon all of the testimony and evidence, the Court finds that awards in the following amounts are appropriate in compensation, as solatium, for the loss suffered by each individual family member as a result of Baker's ordeal:

47

| Jerry Baker (father) | $2,500,000 |
| Lois Baker (mother) | $2,500,000 |
| Craig Baker (brother) | $1,250,000 |
| Estate of David Baker (brother) | $1,250,000 |
| Stacie Baker (sister) | $1,250,000 |

c.    The Family of Jackie Pflug

Pflug's family presents the Court with an additional complication for determining solatium damages:  her first husband, Scott Pflug, to whom she had been married for less than a year at the time of the attack.  The case law is not entirely clear how to deal with solatium damages to a former spouse.  In Searle v. United States, No. 88-CV-2975, 1991 U.S. App. LEXIS 9773 (4th Cir. May 15, 1991), the Fourth Circuit determined that the district judge should have instructed the jury that the surviving spouse remarried within a year or so of the death of his first wife. Id. at *5-6.[15]  As the statute specifically permitted recovery for "mental anguish, emotional pain and suffering, loss of society, companionship, comfort and protection," the court determined that whether the widow or widower had remarried might be relevant to the jury's determination. Id.

Scott Pflug, while he had not been married to Jackie for long, did experience the anguish of learning that she had been shot, and had to support Jackie through her trying early days of recovery, a period so stressful that they eventually divorced because of it.  I do not believe I can award him the same amount, however, that would be awarded had the marriage not ended in divorce.  Therefore, I will depart downward by 50%, awarding him $2 million.  See, e.g., Valore, 700 F. Supp. 2d at 87 (50% is an appropriate standard for a downward departure).

Based upon all of the testimony and evidence, the Court finds that awards in the

_____

[15] Admittedly, this unpublished opinion is not precedent in the D.C. Circuit.  See D.C. Cir. R. 32.1.

following amounts are appropriate in compensation, as solatium, for the loss suffered by each individual family member as a result of Pflug's ordeal:

| | |
|---|---|
| Estate of Rylma Nink (mother) | $2,500,000 |
| Eugene Nink (father) | $2,500,000 |
| Mary Nink O'Donnell (sister) | $1,250,000 |
| Gloria Nink (sister) | $1,250,000 |
| Scott Pflug (spouse 1985-1988) | $2,000,000 |

### 4. *Punitive Damages*

Punitive damages against the state were not available until the 2008 revisions to the FSIA. Valore, 700 F. Supp. 2d at 87. According to the Restatement (Second) of Torts, the purpose of punitive damages is "to punish" a defendant for "outrageous conduct," and "to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1977); see also Acosta, 574 F. Supp. 2d at 30. Courts evaluate four factors in determining a proper punitive damages award: "(1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." Acosta, 574 F. Supp. 2d at 30 (quoting Flatow, 999 F. Supp. at 32).

In this case, the evidence shows defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose *modus operandi* included the targeting, brutalization, and murder of American citizens and others. The character of these acts merits an award of punitive damages. See, e.g., Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 235 (D.D.C. 2002) (finding the character of the defendant's act—where the defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture—supported a punitive damage

award of $300,000,000).  Syria continues to fund terrorist organizations, as noted by Dr. Marius

Deeb in his testimony, *supra*; he testified that Syria, as a state sponsor of terrorism, spends

between US $500,000,000 (at a minimum) and US $700,000,000 annually on terrorism-related

expenditures.  Thus, not only is there a need for deterrence, but there is evidence that the

defendant has substantial wealth.  Finally, Syria has become more actively involved in litigation

in this Circuit; it appealed the judgment in the Gates I case, and filed a motion for relief from

judgment in the district court. Gates v. Syrian Arab Republic, 646 F. Supp. 2d 79, 81-82 (D.D.C.

2009) ("Gates II").

Recent cases have taken different approaches in determining the appropriate amount of

punitive damages in terrorism cases.  In Valore, Heiser, and Acosta, the Court held that an

appropriate measure of punitive damages was the state's annual expenditures on terrorism

multiplied by a number from three to five. Valore, 700 F. Supp. 2d at 88-90; Heiser, 659 F.

Supp. 2d at 30-31; Acosta, 574 F. Supp. 2d at 31.  In Gates I, on the other hand, the Court

awarded each of the families $150 million in punitive damages, for a total of $300 million. Gates

I, 580 F. Supp. 2d at 75.

Examining these cases helps determine which method is most appropriate.  In Valore,

where the Court multiplied the amount expended each year by five, the Court pointed out that

Iran had begun to participate more actively in litigation in the United States.  Valore, 700 F.

Supp. 2d at 89.  The Court hypothesized that, in light of Iran's "paying more attention to the

cases that have been brought against it," it might be more likely that the punitive damages would

have the desired effect of "send[ing] the strongest possible message" to Iran that its support of

terrorism would not be tolerated. Id.  Furthermore, the terrorist act underlying the case was the

1983 bombing of a Marine barracks in Beirut, which was the most deadly state-sponsored terrorist attack on Americans until September 11, 2001, killing 241 American military servicemen. Id. at 57. The punitive award in that case was $1 billion. In Heiser, the estimated terrorism expenditures by Iran were between $50 million and $150 million per year; based on that range, the Court took the mean, $100 million, and multiplied it by three, noting that this Court had, with one exception, never awarded an amount higher than $300 million in punitive damages against Iran. Heiser, 659 F. Supp. 2d at 30-31. In Acosta, the Court had the same numbers, and came to the same conclusion, awarding $300 million dollars in punitive damages against Iran. Acosta, 574 F. Supp. 2d at 31.

As the Court in Gates I noted, the punitive damage finding must still comport with the requirements of due process, and should be commensurate with awards in other FSIA cases. Gates I, 580 F. Supp. 2d at 75 n.19 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)). Were this Court to adopt the mean-terrorism-expenditures-times-three formula, the total punitive damages would be $1.8 billion. While this hijacking and shooting incident were very tragic and serious, and lives were destroyed by it, it would not be appropriate for this Court to award plaintiffs $8 million more than the families and victims of the Beirut bombing in Valore received. Thus, I find that the per-victim standard in Gates I, where the defendant was also Syria, is the more appropriate measure in this case.

The acts in Gates were particularly atrocious; two men were beheaded, while conscious, on camera. While I might otherwise reduce the award in this case, however, Syria's recent engagement with these cases indicates that there may be some chance, as in Valore, that punitive damages could have the desired effect. Thus, I will award $150 million in punitive damages to

each of the victims of the hijacking and their families, for a total of $450 million.

        5.     *Prejudgment Interest*

It is within the Court's discretion to award plaintiffs prejudgment interest from the date of the attack on November 23, 1985, until the date of final judgment. Pugh v. Socialist People's Libyan Arab Jamahiriya, 530 F. Supp. 2d 216, 263 (D.D.C. 2008).  The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations. Id. (citations omitted).  "Courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." Id.  Prejudgment interest is entirely appropriate in this case, and necessary to fully compensate the victims for the injuries they sustained as a result of Syria's material support of ANO.  Such awards compensate the victims for any delay due to litigation, and prevent Syria from profiting from its terrorist attacks.  See id.

An appropriate measure of what rate to use when calculating prejudgment interest is the prime rate, *i.e.*, the rate banks charge for short-term unsecured loans to credit-worthy customers. Oldham v. Korean Air Lines Co., 127 F.3d 43, 54 (D.C. Cir. 1997) (citing Forman v. Korean Air Lines Co., Ltd., 84 F.3d 446, 450 (D.C. Cir.), cert. denied, 519 U.S. 1028 (1996)).  The Court accepted testimony from Dr. Markham regarding his economic analysis and the applicable prime rate of interest for each year from 1985 through 2010. Markham, T-4, 175-177; Pltf's Exh.93, Table 1.  Using his report and the current prime rate,[16] the Court averages the prime rate from

---

[16] The prime rate as of February 2011 is 3.25%; it has not changed since 2009. Economic Data – FRED® of the Federal Reserve Bank of St. Louis, http://research.stlouisfed.org/fred2/series/MPRIME (last visited Mar. 22, 2011).

1985 through 2011, with a result of 7.03%.

Plaintiffs sustained injuries in the form of pain and suffering for the victims of the attack and emotional distress for their immediate families, as addressed by the solatium claims.  Thus, the Court awards plaintiffs prejudgment interest on their damages for solatium and pain and suffering, computed at a rate of 7.03% per annum from November 23, 1985 to the present.

## VI.    CONCLUSION

For the foregoing reasons, final judgments will be entered against defendants by way of a separate Judgment Order in the amounts set forth above, plus any applicable post-judgment interest allowed by law.  In addition, it will be ordered that plaintiffs' state law claims be dismissed, and that plaintiffs James Olsen and Tanner Olsen be dismissed from the case. Furthermore, the case at Civil Action No. 08-cv-505, <u>Jackie Nink Pflug v. Socialist People's Libyan Arab Jamahirya</u>, will be dismissed with prejudice.

A separate Order and Judgment will be issued consistent with this opinion.


_____
JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE